FIRST DIVISION

No. 1-07-1437

| | | |
|---|---|---|
| *In Re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| KAREN A. DEMAR, | ) | Cook County. |
| | ) | |
| Petitioner and Counterrespondent - Appellee, | ) | |
| | ) | No. 03 D 005197 |
| and | ) | |
| | ) | |
| HALE L. DEMAR, | ) | Honorable |
| | ) | Karen G. Shields, |
| Respondent and Counterpetitioner - Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Respondent, Hale L. Demar, appeals the trial court's final ruling on division of property pursuant to the dissolution of his marriage to petitioner, Karen A. Demar. He argues that the trial court wrongfully: (1) reduced his share of the assets in a marital investment account, (2) failed to meaningfully allocate any marital debt that existed at the time of the parties' separation to Karen, and (3) allocated the entire value of the home and investments Karen purchased with the proceeds she received from the sale of the parties' jointly held real estate properties to Karen. We affirm.

## I.  BACKGROUND

This case involves the dissolution of marriage of an affluent couple, Hale and Karen Demar, who prior to their marriage formed a highly successful staffing agency, ProNurse, Inc.  After the parties' marriage, their financial success continued through real estate transactions and passive investing.

Karen and Hale met in the summer of 1984.  Karen was 23 years old and Hale was 35 years old.  Karen and Hale dated for about six years and married on April 27, 1990.  Two children were born to the marriage, namely, Jack, born in 1993, and Madeline, born in 1995.  The parties were awarded joint custody of the minor children, with residential custody awarded to Karen.

### A.  The Parties' Premarital Relationship

When the parties met, Karen held a bachelor's degree in nursing, and worked in the pediatric unit at Rush Presbyterian St. Luke's Medical Center (Rush Presbyterian) earning approximately $20,000 to $30,000 per year.  Hale testified that he was the owner and general manager of the Oak Tree Restaurant in Chicago, earning "a couple hundred thousand" per year.  Hale testified that while he and Karen were dating he opened three other restaurants, but that they failed after a few years.  Hale declared personal bankruptcy in 1985.

Karen moved into Hale's Chicago condominium in late 1984 or early 1985.  In early 1987, Karen left her employment with Rush Presbyterian and joined the Myerscoff Nursing Agency (Myerscoff), a nurse-staffing agency that provided nurses to hospitals

upon request, because Myerscoff offered her greater flexibility in setting her work schedule. Karen earned considerably more than she earned with Rush Presbyterian, but became discontent with her work at Myerscoff because Karen's specialty was pediatric intensive care, and Myerscoff often sent her to care units such as adult intensive care for which she was not qualified. In late 1987, Karen discussed her career options with Hale, including the possibility of continued schooling for advanced training. Recognizing the shortage of qualified nurses in the Chicagoland area and the fact that nurses affiliated with nursing agencies earned 40% more than hospital staff nurses while being better able to control their schedules, the parties saw an opportunity for a successful business and decided to investigate its possibilities. Their key concept was to create a nurse-staffing agency run by a professional nurse who could understand and address the concerns of nurses, thereby attracting talented nurses who would normally not associate with a staffing agency.

Karen left her employment with Myerscoff in mid-1987. She joined every nurse-staffing agency in Chicago, where, using a checklist she and Hale developed, she collected information on the scope of qualifications testing and hiring procedures of large and small agencies, as well as figures related to pay rates and nursing specialties. Then, Karen interviewed several hospital nursing directors as well as unit-level nurses to gather information about hospitals' attitudes toward agency nurses. From the data she collected, Karen created an employment package containing applications, screening forms, and specialty specific examinations, while Hale developed approaches to maintain the

stability of the quality of the nurses they hired. ProNurse Staffing, Inc. (ProNurse), was incorporated in November 1987, with 1,000 shares of stock issued. Hale provided the start-up money for ProNurse. Karen testified that she did not remember the amount of money Hale contributed to the start-up costs of ProNurse, but testified that it was probably between $50,000 and $100,000.

The parties enlisted the help of Bonnie Zawora, an experienced nurse-staffing coordinator, to help start the company. The parties offered Bonnie 200 of the 1,000 shares of issued stock in ProNurse to induce her employment. Because of Hale's recent bankruptcy proceeding, the remaining 800 shares were issued to Hale's father, Marshall Demar. Marshall, who paid nothing for the shares of issued stock, soon transferred his 800 shares to his wife, Raylie Demar.

Karen performed all of the activities regarding the marketing of ProNurse to various Chicagoland hospitals. Hale handled all financing and contract negotiations related to ProNurse's activities.

At the time ProNurse was created, Karen, Hale, and Bonnie worked long hours. Karen, who was the president and director of nursing, interviewed potential nurses, tested their qualifications, and obtained hospital accounts for ProNurse's services. She also met with computer programmers to create a program that would handle all the data concerning various hospitals, hospital shifts, payroll, and accounts receivable. Karen and Bonnie handled payroll and staffing, all the daily record keeping, incident reports, and shared the responsibility of answering phones and taking staffing requests from

4

Chicagoland area hospitals 24 hours a day, 7 days a week. Karen testified that she worked between 70 and 90 hours a week and received about 200 calls each day. Hale reviewed all the weekly reports of hours, billing, and accounts receivable and payable, and managed the company's cash flow.

Karen testified that when she and Hale discussed the ownership structure of ProNurse, she understood that Hale would own 60%, Karen 20%, and Bonnie 20%. Hale testified that he had no discussions with Karen about the issuance of stock because ProNurse "was my company. I founded it *** I started the company. I put the team together. I funded it. I took the risk. It was my exposure. It was my decision to make, and frankly I thought that 20% on the upside was a very generous present both to Karen and to Bonnie." When asked how many conversations he had with Karen about stock prior to the formation of ProNurse, Hale responded, "Not many. There were not a lot [sic] of conversations. It was, 'This is what I am going to do, allow you or give you, Bonnie, Karen.' That was it. I wasn't open to discussion *** ." When asked whether Karen had contributed to staffing, acquiring hospital contracts, and handling the marketing of ProNurse services, Hale answered, "She was paid for those services."

Bonnie's shares in ProNurse were redeemed in 1993. Karen testified that she thought that she owned 25% of ProNurse and that Hale owned 75% of ProNurse, and while the company's federal K-1 tax form and federal tax returns were based on that percentage, no original stock certificate reflected that division. Hale testified that he believed Karen's shares had come from his mother; he also testified that his mother's

shares had been tendered back or cancelled, and at one point he agreed that he had received only 600 shares from his mother, but in 1989, when Karen and Hale both received stock in their own names, the certificates showed Hale owning 80% and Karen 20%, even though Bonnie still owned 20% of the ProNurse stock at that time. The trial court found that Karen owned 20% and Hale owned 80% of ProNurse stock. In making this finding, the court found persuasive copies of the two stock certificates and lost certificate affidavits signed at the time of the sale of ProNurse, which reflected the 80/20 ownership figures.

ProNurse was an almost immediate success, generating $3 million in revenue in 1988, its first full year of operation, and producing "huge income" in 1989. Based upon ProNurse's success, the parties decided to franchise their company. Karen compiled a manual directing how the franchises were to be operated, while Hale handled all the financial and legal aspects of franchising. The parties decided to open Los Angeles, California, and Miami, Florida, locations, and in 1989 they rented a home in Bel Air, California, to oversee the opening of the Los Angeles franchise; they later opened the Miami franchise. Both franchises failed soon thereafter.

The California venture did not end amicably, and the parties separated. Hale left California after several months and moved back to his Chicago condominium; Karen remained in the Bel Air home until the end of the lease. She later returned to Illinois and rented an apartment. The parties reconciled, they and married in Hawaii on April 27, 1990.

## B. The Parties' Marital Relationship

After the wedding, the parties lived in Hale's Chicago condominium. In December 1993, the parties' first child was born. Following a six to eight-week maternity leave, Karen returned to ProNurse. After approximately a year, she reduced her work hours to 5 to 20 hours per week and covered staff meetings, important hospital and marketing meetings, and contract negotiations, although she worked full-time when necessary to cover ProNurse employee vacations and maternity leaves.

The parties left the Chicago condominium in 1994 and purchased a home in Wilmette, Illinois. Their second child was born in 1995. Karen stopped working regular hours for ProNurse, although she continued to work from home and still covered for vacations and maternity leaves. ProNurse was now run primarily by personnel she and Hale had hired. The parties purchased a vacation home on Sea Island, Georgia, in 1997 and vacationed there regularly.

In 1997, the parties took a second mortgage on the Wilmette home, and Hale opened a margin account at Citibank to buy shares of Visx (a publicly traded company that is engaged in laser vision correction technologies) stock over the next several months. In 1999, Hale sold the shares in Visx for about $11.5 million, paid capital gain taxes, paid off the margin debt at Citibank, and transferred the $4.5 million balance to a new Smith Barney account. Hale opened the Smith Barney account in his own name and bought municipal bonds using both funds from the $4.5 million and a margin line of credit.

In 2001, while the parties were vacationing in Georgia, Karen received a telephone call from one of the ProNurse staffing coordinators, informing her that three of the four ProNurse office employees planned to leave the company, take lists containing the names and phone numbers of all the nurses affiliated with ProNurse, and open their own agency. Karen and Hale returned to Chicago immediately. Karen terminated the three employees and for the next six months worked 70 to 90 hours a week to cover the loss of staff workers.

The parties decided to sell ProNurse because Karen worked too many hours. Hale expressed his desire to relocate the family to Hawaii, and Karen agreed to try the relocation for a year. Hale negotiated a sale of ProNurse. Before the closing of the sale, the buyer requested Karen and Hale sign individual lost certificate affidavits, since various documents showing the respective ownership interests in ProNurse were conflicting. The attorney drafted affidavits for Hale and Karen, based on information provided by Hale, and Karen testified that although she objected to her affidavit because it reflected only a 20% ownership interest in ProNurse, she signed it so that the sale would close. Karen testified that Hale assured her that all the money from the sale was going to be deposited into their joint account and utilized to purchase a jointly held residence in Hawaii.

On March 11, 2002, Karen and Hale received the first payment of an undivided $4.5 million for the sale of ProNurse, in the form of a single wire transfer into their joint account at Northern Trust Bank (Northern Trust). The parties also received two

promissory notes for a total of $1 million, one for $200,000 payable to Karen and another for $800,000 payable to Hale. The promissory notes were paid within a year.

When the $4.5 million was deposited into the parties' joint account at Northern Trust, the account already had a balance of over $240,000. Hale then purchased a jointly titled Cook County municipal bond through a newly created joint securities account at Northern Trust, paid the securities broker and paid Illinois taxes on the monies received from the sale of ProNurse, and retained $100,000 to pay legal and accounting fees. Hale then transferred $4.2 million, including the Cook County municipal bond, into the Smith Barney account and utilized that account to purchase various other bonds.

The parties placed their Wilmette and Georgia homes for sale and bought a home in Maui, Hawaii, for $1.525 million. Hale moved to Hawaii first without Karen and the children. Before Karen and the children arrived to Hawaii, Hale purchased an undeveloped parcel of land near the couple's Hawaii residence for $1.65 million. Karen later learned that Hale had transferred the monies received from the sale of ProNurse out of the Northern Trust account into his Smith Barney account to buy bonds and utilized margin debt from Smith Barney to purchase the Hawaii properties rather then utilizing the ProNurse funds.

Hale utilized more than $900,000 of the proceeds received from the sale of ProNurse to pay down the existing margin debt in the Smith Barney account. He then purchased more bonds with the ProNurse proceeds, allocating "in [his] mind" three

specific bonds to Karen, representing her 20% of the ProNurse proceeds, and apportioning the remainder to himself.

The parties' federal tax liability for 2002 was $969,662, $481,160 of which had been previously paid in three quarterly installments, each drawn on a Smith Barney line of credit. Hale then paid a total of $40,200 to the Illinois Department of Revenue, also drawn on the Smith Barney line of credit.

Hale sold three bonds in 2002 and seven in 2003 to pay taxes and pay down the margin debt on the Smith Barney account.

The parties' marriage began to fail in March 2003. Karen and the children returned to Illinois and moved into the parties' Wilmette residence and removed the home from the market. Hale also returned to Illinois a few months later. Karen and the children moved out of the Wilmette residence shortly thereafter.

### C. Petitions for Dissolution of Marriage

Karen filed a *praecipe* for summons on May 12, 2003, in the circuit court of Cook County, and Hale filed his appearance on June 5, 2003. The parties placed the two Hawaii properties on the market. The real estate in both Hawaii and Georgia (that had been listed for sale previously) sold in 2003. The parties divided the proceeds from the sales equally. Karen filed a petition for dissolution of marriage on October 29, 2003, and Hale responded and filed a counterpetition for dissolution of marriage on November 25, 2003.

Karen utilized her share of the proceeds from the sale of the Hawaii and Georgia real estate to purchase a home, to pay living expenses and legal fees related to this dissolution of marriage proceeding, and to fund investments. Hale deposited his share of the proceeds from the sale of the aforementioned real estate into the Smith Barney account and utilized the proceeds to pay down the margin debt. When Hale asked Karen to use her share of the proceeds from the sale of their real estate to pay half of the margin debt, she responded that she would pay half if he would split the account with her. Hale refused. Hale then used margin debt from Smith Barney to buy an $82,000 motor vehicle.

At various times during the proceedings before the trial court, Karen charged Hale with dissipating marital assets, ultimately charging Hale with unjustifiably spending $1,066,446 between June 2003 and April 2006. Of that total, Hale identified $42,615.84 he used for vacations with the parties' children, $32,643.66 for new furnishings and upgrades to the Wilmette residence, $123,650 for two new motor vehicles, $45,429.56 in living expenses, $367,500 that he transferred to the Northern Trust account, and $24,742,44 in expenditures he admitted to making but did not identify at trial. He also admitted to gifting several items to his girlfriend.

Following the close of evidence, both parties submitted written closing arguments to the trial court. The trial court issued a memorandum opinion, finding that Hale owned 80% and Karen owned 20% of ProNurse in 1989 and that each party's shares in ProNurse stock were nonmarital property. The trial court also found that Hale had

11

commingled his proceeds from the sale of the ProNurse stock with the marital estate. In dividing the marital estate, the court found that Hale was entitled to consideration for his large financial contribution to the marriage. The *Distribution and Contribution* section of the trial court's memorandum opinion stated that it would be "appropriate that Hale be awarded 70% of the Smith Barney account and 50% of all other marital assets." Later, in the same section, the trial court found that Hale was entitled to 60% of the Smith Barney proceeds and that Karen was entitled to 40%. With regard to the Smith Barney account, the memorandum opinion stated:

> "The difficulty with the distribution of the Smith Barney account is that this account, which contained commingled marital funds and bonds, Hale's non-marital funds from Pro-Nurse, Karen's non-marital funds from Pro-Nurse, and Hale's moneys [sic] from the pre-distribution of marital property, was used by Hale. He freely traded bonds, added margin and reduced margin [debt], paid taxes on his and her Pro-Nurse stock income, paid his personal taxes and those created by the Smith Barney trading, wrote almost $75,000 in checks *** in a one year period (April 2005 – May 2006). Hale also used the marital Northern Trust account, which contained marital funds at the time of separation, as his personal account writing checks of almost $300,000 from November 2003 through May 2006.[1]

---

[1] In fact, the Northern Trust account had been closed when the parties moved to

Based on all of the facts, Hale contributed more funds to the

marital estate when he commingled his 80% share of Pro-Nurse proceeds

and his 50% share of the pre-distributed marital funds within a marital

account already containing marital funds and bonds and margin debt.

Hale also deposited Karen's Pro-Nurse proceeds to the same account.

Hale complicated the matter by then buying and selling bonds using all

these funds and margin debt. He also paid marital and significant non-

marital debts and took cash for his own use from this same account. The

court must look to a reasonable distribution of the Smith Barney proceeds.

Based on all of the foregoing and applying the statutes, Hale is awarded

60% of the Smith Barney account ($3,455,763) and 60% of the loss carry

forward. He is responsible for 60% of the margin. Karen is awarded

$2,318,509 (40%) and 40% of the loss carry forward. She is responsible

for 40% of the margin debt."

The trial court also discussed the predissolution distribution of marital property

derived from the parties' sale of their Hawaii and Georgia real estate:

"Subsequent to the parties' separation, each received $790,737

from the sale of the Hawaii home, $837,307 from the sale of the Georgia

property; and $1,353,646 from the sale of the [Hawaii property]. Karen

received an additional $35,000 from a refund of moneys [sic] paid to the

_____

Hawaii.

13

[Hawaii] Sea Island Country Club. With these moneys [sic], Karen bought a home and placed the remainder in a number of accounts. Although she still has a monthly income from a consulting contract and a non-competition contract with Pro-Nurse, Karen has spent some of these moneys [sic] for living expenses. She has had total control of these funds since receiving them.

Hale's total income from the sale of the Hawaii and Georgia properties was $2,981,690 *** . His moneys [sic] were deposited into the marital Smith Barney account.

Both parties have made dissipation claims against one another for the use of these funds they each received since separation. Because the court finds it appropriate that all funds, except the Smith Barney account, be split equally, dissipation will not be considered. The use of the funds by each party was appropriate use of their pre-distributions of some of the marital property."

Karen's counsel prepared a proposed order of dissolution of marriage based on the trial court's memorandum opinion. Hale was provided an opportunity to provide objections to the proposed order submitted by Karen's counsel, and he did so. Hale objected to the trial court's allocation of the Smith Barney account, arguing that the trial court impermissibly reduced his award in the Smith Barney account from 70% to 60%. Hale argued, "the Court should not, and could not have intended to further penalize Hale

for the same withdrawals by giving Karen a share of Hale's pre-distribution subsumed within the Smith Barney account without also including Karen's pre-distribution in dividing the other marital assets." Hale argued further:

> "Looked at another way, if Karen is awarded 100% of her share of the proceeds from the sale of the Georgia and Hawaii real estate and the assets purchased therewith as a pre-distribution, and she also receives 40% of the Smith Barney account into which Hale deposited 100% of his pre-distribution proceeds, she will effectively receive 40% of Hale's remaining pre-distribution in addition to her 100% share. Certainly, and especially in light of the finding that Hale made a greater contribution to the parties' estate, the Court did not and could not reasonably intend this inequitable result."

In response, Karen argued that the trial court properly allocated her the monies from the sale of the Georgia and Hawaii properties separate and apart from the marital assets to be divided in halves. Specifically, Karen argued:

> "The Court was very clear at the pre-trial conference on January 17, 2007 that the monies Karen received from sale of the three (3) properties and country club membership were monies Karen kept separate and apart from the other marital assets. Karen used these funds to purchased [sic] her home and placed the remainder of the funds in various accounts. The Court awarded Karen these assets separate and apart from

15

the assets to be divided 50/50. Hale, on the other hand, co-mingled all of the funds he received from the sale of the three (3) properties with already existing marital funds held in the Smith Barney Account. During the pendency of this case Hale complicated matters by buying and selling bonds in the Smith Barney account, using the funds and trading on margin. He also paid marital and significant non-marital debts from this account and spent a significant portion of the proceeds for his own use. Hale had sole access to and control over this account during the pendency of the case; as such, the Court could not extract from said account the funds he received from the three (3) properties from the other marital funds that existed in the account. Ultimately, the Court allocated the account 60/40 in Hale's favor, taking into consideration numerous factors, including his contributions to the marital estate, the co-mingling of funds, his expenditures and the like."

On March 15, 2007, the trial court issued an amended memorandum opinion. The amended memorandum opinion states that Hale had commingled his 80% share of the nonmarital ProNurse proceeds with marital property and that he was "not entitled to reimbursement from the Smith Barney Account for any non-marital property he contributed as all of the property has been transmuted to marital and cannot be retraced." The amended memorandum opinion then states that although Hale was not entitled to reimbursement "because the funds he commingled are not retraceable by clear and

convincing evidence, Hale [was] entitled to consideration for his large financial contribution to the marital assets."

The amended memorandum opinion states that all of the parties' funds, other than the funds contained in the Smith Barney account, would be split equally. The Smith Barney account would be divided 60/40 in Hale's favor. The paragraph in the original memorandum opinion that stated that Hale was entitled to 70% of the Smith Barney account was deleted from the amended memorandum opinion. With regard to the parties' dissipation claims involving the use of the funds from the sale of the Georgia and Hawaii real estate, the amended memorandum opinion states as follows:

"Both parties have made dissipation claims against one another for the use of these funds (Hawaii and Georgia) they each received since separation. Because the court finds it appropriate that all funds, except the Smith Barney account, be split equally, dissipation will not be considered. The use of the funds by each party was an appropriate use of their pre-distributions of some of the marital property. Therefore, the equal moneys [sic] that each party received from the sales of the Hawaii property and the Georgia property are pre-distributions of marital property. Any properties bought with or accounts opened (any use) of these moneys [sic] by the individual is that person's property whether the money has increased in value or decreased in value. The only exception to this is the deposit of Hale's pre-distribution into the marital Smith-Barney account.

17

For several years, the Smith Barney account has contained commingled marital funds and bonds (and a margin debt), Hale's non-marital proceeds from the Pro-Nurse sale (which Hale took control over), and Hale's moneys [sic] from the pre-distribution of marital property (sale of Georgia and Hawaii properties.) Hale has used this account freely while Karen had no access. From this account, Hale has traded bonds, added margin and reduced margin, paid taxes on his and her Pro-Nurse stock income, paid his personal taxes and those created by the Smith Barney trading, written almost $75,000 in checks to cash in a one year period (April 2005-May 2006) and paid other marital and non-marital debt. Hale also used the marital Northern Trust account, which contained marital funds at the time of separation, as his personal account writing checks of almost $300,000 from November 2003 through May 2006.

Hale has the burden to demonstrate to the court his contribution to this marital account. Other than stipulations that he made non-marital contributions and testimony regarding payments made from the account, Hale did not attempt to present evidence of a tracing to distinguish the funds. This was not a failing on his part; it simply is impossible with the amount of commingling that has taken place. Therefore, the court must look at all these facts and determine a reasonable percentage distribution of the Smith-Barney account.

Based on all of the foregoing and applying the statutes, Hale is awarded 60% of the Smith Barney account ($3,455,763) and 60% of the loss carry forward. He is responsible for 60% of the margin. Karen is awarded $2,318,509 (40%) and 40% of the loss carry forward. She is responsible for 40% of the margin debt *** . Anything not otherwise distributed is to be split 50% to each. <u>This includes any increase in the Smith-Barney account total value since the date of trial assuming that Hale has not paid any more non-marital debt from the account.</u>" (Emphasis in original.)

### D. The Judgment for Dissolution of Marriage

On April 26, 2007, the trial court entered the judgment for dissolution of marriage. The trial court found that the total value of the parties' marital assets was $11,249,086. The trial court allocated the home and the investments made by Karen with the monies she received from the sale of the Georgia and Hawaii properties to Karen. The court then divided the value of the Smith Barney account, valued at $5,796,273 at the time the petition for dissolution of marriage was filed, 60/40 in favor of Hale. The trial court then divided all other assets in the marital estate into halves. With respect to the allocation of the Smith Barney account, the trial court found:

"Pursuant to the Amended Memorandum Opinion, Karen was awarded 40% of the Smith Barney account ($2,318,509) and 40% of the loss carry forward as of May 31, 2006. She was also responsible for 40%

19

of the margin debt. Since that time, however, Hale has had sole access to the account and has bought and sold bonds, expended a significant portion of the account and interest and has been credited to the account. On April 25, 2007, after hearing extensive argument from counsel for both parties, this court adjusted the allocation of the Smith Barney account to reflect the events that have transpired since May 31, 2006, as stated below.

Karen shall receive 40% of the Smith Barney account as of March 31, 2007, which shall be funded *** from the assets within said account. In addition, Karen shall be paid 40% of the total value of the checks written from the account subsequent to May 31, 2006, until March 31, 2007. Karen shall also be responsible for 40% of any margin debt owed relating to said account and shall receive 40% of the loss carry forward."

The trial court also found that the parties were responsible for their own attorneys' fees. The trial court entered the judgment for dissolution of marriage on April 26, 2007, and this appeal followed.

## II. ANALYSIS

Hale argues that the trial court's distribution of the marital assets was an abuse of the trial court's discretion. Specifically, Hale argues that the trial court impermissibly (1) reduced his share of the assets in the marital Smith Barney account, (2) failed to meaningfully allocate any of the Smith Barney marital margin debt that existed at the time of the parties' separation to Karen, and (3) allocated the entire value of the home

and investments Karen purchased with the proceeds she received from the sale of the Georgia and Hawaii properties, and did not include that value in the 50/50 division of marital property.

Preliminarily, we will first address Hale's argument that the trial court reduced his share in the marital Smith Barney account. Hale bases his argument on the fact that the trial court's original memorandum opinion stated that it would be "appropriate that Hale be awarded 70% of the Smith Barney account and 50% of all other marital assets." He argues that the trial court then impermissibly reduced his award in the Smith Barney account to 60% to penalize him for exercising exclusive control over the account. A review of the trial court's original memorandum opinion, amended memorandum opinion, and judgment for dissolution of marriage demonstrates otherwise.

As noted, the trial court's original memorandum opinion stated that it would be "appropriate that Hale be awarded 70% of the Smith Barney account and 50% of all other marital assets." Later, in the same section, the trial court found that Hale was entitled to 60% of the Smith Barney proceeds and that Karen was entitled to 40%. After Hale's objections to the allocation of the Smith Barney account contained in the original memorandum opinion, the trial court issued an amended memorandum opinion, which stated that the Smith Barney account would be divided 60/40 in Hale's favor. The paragraph in the original memorandum opinion that stated that Hale was entitled to 70% of the Smith Barney account was deleted, and did not appear in the amended memorandum opinion. The amended memorandum opinion thus superseded the original

memorandum opinion. *Gibson v. Belvidere National Bank & Trust Co.*, 326 Ill. App. 3d 45, 47 (2001). Furthermore, it does not appear that the trial court ever intended to allocate 70% of the Smith Barney account to Hale, as the trial court's original memorandum opinion states that Hale was to be allocated 60% of the Smith Barney account. In fact, the 60% allocation appeared in the same paragraph that was later deleted by the amended memorandum opinion, which recited the 70% allocation. Considering the foregoing, we find Hale's argument that the trial court wrongfully reduced his award in the Smith Barney account unpersuasive.

We now turn to the trial court's division of the parties' marital property. On appeal, Hale argues that the trial court's division of the parties' marital property was unjust because the division failed to take into account Hale's greater financial contribution to the marital estate, failed to meaningfully allocate any of the Smith Barney marital margin debt that existed at the time of the parties' separation to Karen, and wrongfully allocated the entire value of the home and investments Karen purchased with the proceeds she received from the sale of the Georgia and Hawaii properties to Karen without including that value in the 50/50 division of the marital property.

A. Commingling and Transmutation

A review of the trial court's finding regarding transmutation of the parties' nonmarital assets gained by the creation and sale of ProNurse is necessary for an understanding of the trial court's division of the marital estate in the case at bar.

According to section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503 (West 2004)), prior to distributing property upon dissolution of marriage, the trial court must classify the property as marital or nonmarital. *In re Marriage of Davis*, 215 Ill. App. 3d 763, 768 (1991). We apply a manifest weight of the evidence standard to the trial court's findings on the existence of marital and nonmarital property. *In re Marriage of Berger*, 357 Ill. App. 3d 651, 659-60 (2005).

"Normally, property acquired by either spouse after the marriage but prior to judgment of dissolution is presumed to be marital property regardless of how title is held." *In re Marriage of Davis*, 215 Ill. App. 3d at 768. Section 503(b) of the Act states: "The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a) of this Section." 750 ILCS 5/503(b) (West 2004). Section 503(a) of the Act excepts certain property known as nonmarital property where the "property [was] acquired before the marriage." 750 ILCS 5/503(a)(6) (West 2004). It is undisputed that the parties' respective shares of ProNurse stock were nonmarital property as each of the parties' shares in ProNurse were acquired prior to their marriage, and the trial court found thusly.

However, the trial court found that the nonmarital property acquired by the sale of the parties' respective shares of ProNurse stock had been transmuted into marital property. As noted, the parties sold ProNurse after they were married. On March 11, 2002, Karen and Hale received a first payment of an undivided $4.5 million for the sale of ProNurse, in the form of a single wire transfer into their jointly held Northern Trust

account. The parties also received two promissory notes for a total of $1 million, one for $200,000 payable to Karen and another for $800,000 payable to Hale. The promissory notes were paid within a year.

When the $4.5 million was deposited into the parties' joint Northern Trust account, the account already had a balance of over $240,000. Hale then purchased a jointly titled Cook County municipal bond through a newly created jointly titled securities account at Northern Trust. Hale then transferred $4.2 million, including the Cook County municipal bond, into the Smith Barney account and utilized that account to purchase various other bonds.

The Smith Barney account already contained a great deal of marital assets prior to the $4.2 million transfer just mentioned. As noted, the parties wed on April 27, 1990. In 1994, the parties left Hale's Chicago condominium and purchased a home in Wilmette, Illinois. In 1997, the parties took a second mortgage on the Wilmette home, and Hale opened a margin account at Citibank to buy shares of Visx over the next several months. In 1999, Hale sold the shares in Visx for about $11.5 million. After paying capital gains taxes and retiring margin debt at Citibank, he transferred the $4.5 million Citibank balance to the Smith Barney account and utilized the funds and a margin line of credit to purchase other municipal bonds.

By the time of the dissolution of the parties' marriage, these funds had been used to purchase many other bonds. Thus, newly created assets came into being. Once marital and nonmarital funds are commingled and lose their identity through acquisition

24

of newly created assets during the marriage, the assets are marital. 750 ILCS 5/503(c)(1) (West 2004); *In re Marriage of Davis*, 215 Ill. App. 3d at 769, citing *In re Marriage of Malters*, 133 Ill. App. 3d 168 (1985).

The trial court then found that Hale was unable to support his claim of reimbursement for contributions made by him to the marital estate from his nonmarital estate; namely, his nonmarital assets gained by the sale of his 80% stake in ProNurse.

"Section 503(c)(2) of the Act provides that when one estate contributes to the property of another estate, the contributing estate is to be reimbursed from the estate receiving the contribution notwithstanding any transmutation, provided the reimbursement is traceable by clear and convincing evidence." *In re Marriage of Davis*, 215 Ill. App. 3d at 770; 750 ILCS 503(c)(2) (West 2004). "Tracing requires that the source of the funds be identified." *In re Marriage of Davis*, 215 Ill. App. 3d at 770.

By the very nature of the Smith Barney account, it is impossible to ascertain the source of funds with which specific bonds were purchased. Although a large portion of the funds in the Smith Barney account at the time of dissolution of marriage was contributed by Hale's deposit of his nonmarital assets gained by the sale of his shares in ProNurse, it is impossible to ascertain the source of funds with which specific bonds were purchased in the Smith Barney account. Hale therefore failed to produce clear and convincing evidence that would trace the individual bonds purchased by nonmarital funds. *In re Marriage of Davis*, 215 Ill. App. 3d at 770; *General Motors Acceptance Corp. v. Stovall*, 374 Ill. App. 3d 1064, 1071 (2007) (a judgment is against the manifest

weight of the evidence only when an opposite conclusion is apparent from a review of the record, or when a trial court's findings appear to be " ' "unreasonable, arbitrary, or not based on evidence" ' [Citation.] ").

Having reviewed the trial court's finding of transmutation and the trial court's finding that Hale's contribution of assets to the marital estate from the sale of his shares of ProNurse stock is not traceable, we find that the trial court's classification of the assets in the Smith Barney account as marital was not against the manifest weight of the evidence.

### B. Division of Marital Estate

We now turn to a review of the trial court's division of the marital estate. "The touchstone of apportionment of marital property is whether the distribution is equitable [Citations], and each case rests on its own facts." *In re Marriage of Jones*, 187 Ill. App. 3d 206, 222 (1989), citing *In re Marriage of Bentivenga*, 109 Ill. App. 3d 967, 972 (1982).

We will not disturb a trial court's division of marital property unless an abuse of discretion is shown. *In re Marriage of Jones*, 187 Ill. App. 3d at 222, citing *In re Marriage of Partyka*, 158 Ill. App. 3d 545, 550 (1987), and *In re Marriage of Hilkovitch*, 124 Ill. App. 3d 401, 414 (1984). A trial court does not abuse its discretion unless, in view of all of the circumstances, its decision so exceeded the bounds of reason that no reasonable person would take the view adopted by the trial court. *In re Marriage of Jones*, 187 Ill. App. 3d at 222, citing *In re Marriage of Brooks*, 138 Ill. App. 3d 252

26

(1985); *In re Marriage of Miller*, 112 Ill. App. 3d 203, 207 (1983); *In re Marriage of Lee*, 78 Ill. App. 3d 1123, 1127 (1979). The Act does not require an equal division of marital property; rather, as noted, it requires an equitable division, taking into account the factors listed under section 503(d) of the Act. *In re Marriage of Jones*, 187 Ill. App. 3d at 223, citing *In re Marriage of Aschwanden*, 82 Ill. 2d 31, 37 (1980); *In re Marriage of Melnick*, 127 Ill. App. 3d 102, 107 (1984); *In re Marriage of Sevon*, 117 Ill. App. 3d 313, 318 (1983).

Pursuant to section 503(d) of the Act, the trial court shall divide marital property in just proportions considering all relevant factors, including:

"(1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the dissipation by each party of the marital or non-marital property;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

* * *

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

27

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income[.] " 750 ILCS 5/503(d) (West 2004).

The trial court has broad discretion in applying these factors and is authorized to award either property or maintenance, both property and maintenance, or property in lieu of maintenance. *In re Marriage of Jones*, 187 Ill. App. 3d at 223, citing *In re Marriage of Gan*, 83 Ill. App. 3d 265, 271 (1980).

In the case at bar, the trial court awarded 60% of the Smith Barney account assets and 50% of all other marital assets to Hale. The trial court did not award maintenance to either party. Of particular interest in the case at bar is the trial court's finding with regard to the monies gained by each party from the sale of the parties' two real estate holdings in Hawaii and one real estate holding in Georgia. As noted, each party received approximately $3 million from the sale of the aforementioned properties. Karen utilized her share of the proceeds from the sale of the Hawaii and Georgia real estate to purchase a home, pay living expenses and legal fees relating to this dissolution of marriage proceeding, and to fund investments. Hale deposited his $3 million share of the proceeds from the sale of the aforementioned real estate into the Smith Barney account and utilized the proceeds to pay down margin debt. The trial court termed the parties'

respective $3 million shares as "pre-distributions" of marital property. With the exception of Hale's deposit of his "pre-distribution" into the Smith Barney account, the court allocated each "pre-distribution" to the party already holding the assets. According to this finding, Karen was allocated the home and investments she purchased with her "pre-distribution" of marital property.

Applying the factors provided by section 503(d) of the Act, we note that the marriage was of long duration; Karen made substantial contributions as a homemaker, especially in acting as the primary caretaker for the two children born to this marriage; there was evidence that Hale still owned a portion of the Oak Tree Restaurant at the time of dissolution and derived substantial income therefrom; Karen was awarded residential custody of the two minor children; and no maintenance was awarded. In fashioning the property division under review, the trial court considered all relevant factors contained in section 503(d) of the Act. Although other courts may have apportioned the property differently, the property distribution here does not indicate an abuse of discretion warranting reversal. *In re Marriage of Davis*, 215 Ill. App. 3d at 775. We do not find an abuse of discretion because we cannot find that the trial court's decision so exceeded the bounds of reason that no reasonable person would take the view adopted by the trial court in dividing the marital estate. *In re Marriage of Jones*, 187 Ill. App. 3d at 222.

Despite the foregoing, Hale argues that the trial court's division of the marital property was highly unjust because the division failed to take into account Hale's greater financial contribution to the marital estate, failed to meaningfully allocate any of the

Smith Barney marital margin debt that existed at the time of the parties' separation to Karen, and wrongfully allocated the entire value of the home and investments Karen purchased with her "pre-distribution" of marital property. However, the trial court did factor in Hale's contribution of his "pre-distribution" into the Smith Barney account. As noted, the trial court found that the equal monies that each party received from the sales of the Hawaii property and the Georgia property were "pre-distributions" of marital property and that any properties bought with or accounts opened with those monies by the parties' was that person's property. The trial court stated that the only exception to its finding was Hale's deposit of "pre-distribution" of marital property into the marital Smith Barney account. After considering Karen's award of the home and investments purchased with her portion of the "pre-distribution" of marital property, Hale's act of retiring the margin debt in the Smith Barney account, and the parties' contributions to the marital estate, the trial court allocated the Smith Barney account 60/40 in Hale's favor. Clearly, all of the foregoing factors were considered by and applied by the trial court in awarding Hale a greater portion of the Smith Barney account. Despite Hale's urging, we find no abuse of discretion in the trial court's division of the parties' marital estate.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

WOLFSON, and HALL, JJ., concur.

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
## (Front Sheet to be attached to each Opinion)

**Please use the**
**following form:**

]
]
]

**In Re MARRIAGE OF**

**KAREN A. DEMAR,**

Petitioner and Counterrespondent - Appellee,

and

**HALE L. DEMAR,**

Respondent and Counterpetitioner - Appellant.

**Complete**
 **TITLE**
**of Case.**

**Docket No.**

**COURT**

**Opinion Filed**

**No. 1-07-1437**
**Appellate Court of Illinois**
**First District, First Division**

**SEPTEMBER 29. 2008**
**(Month, Day and Year)**

**JUSTICES**

] **PRESIDING JUSTICE ROBERT E. GORDON delivered the**
]**opinion of the court.**

] **WOLFSON and HALL, JJ., concur.**

**APPEAL from the** ] **Lower Court and Trial Judge(s) in form indicated**
**Circuit Court**] **in margin:**
**of Cook County;** ] **Appeal from the Circuit Court of Cook County.**
**the Hon:_____** ]
**Judge Presiding** ] **Honorable Karen G. Shields, Judge Presiding.**

**For APPELLANTS** ]**Indicate if attorney represents APPELLANTS or**
**John Doe of** ]**APPELLEES and include attorneys of counsel.**
**Chicago.** ]**Indicate the word NONE if not represented.**
**For APPELLEES,** ]--------------------------------------------------------------------------------------
-

**Smith and** ] **Novoselsky Law Offices**
**Smith, of** ] **Chicago, Illinois   60602**
**Chicago.** ] **Attorneys for Respondent/Counter-Petitioner/Appellant**
**Brown,** ] **Attn: David A. Novoselsky and Leslie J. Rosen**
**of Counsel.** ]     **OF COUNSEL**
]
**Also add atty.**] **Schiller, Du Canto and Fleck, LLP**
**for third party** ] **Chicago, Illinois   60601**
**appellants** ] **Attorneys for Appellee**
**or appellees.** ] **Attn:  Arnold  B.  Stein,  Sarane  C.  Siewerth,  and  Jennifer Dillon**
**Kotz**
]      **OF COUNSEL**
]
]

_____**(USE REVERSE SIDE IF NEEDED**_____