NOTICE

Decision filed 12/23/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 190046-U

NO. 5-19-0046

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| CHRISTY LUGGE, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 13-D-912 |
| | ) | |
| JAMES LUGGE, | ) | Honorable |
| | ) | Thomas B. Cannady, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE OVERSTREET delivered the judgment of the court.
Presiding Justice Welch and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court did not abuse its discretion in determining parties' incomes and awarding child support and maintenance.

¶ 2    During the dissolution of marriage proceedings below, the petitioner, Christy Lugge, and the respondent, James Lugge, entered into a marital settlement agreement to divide marital assets, and the circuit court heard evidence on the remaining issues, including child support and maintenance. On appeal, Christy alleges that in determining child support and maintenance, the circuit court improperly considered income generated from cash awarded her pursuant to the marital settlement agreement. Christy requests this

1

court to reverse and remand to recalculate income for purposes of child support and maintenance. We affirm the decision of the circuit court.

¶ 3                                   I. BACKGROUND

¶ 4     The parties married on February 14, 1987, and four children were born of the marriage. On November 22, 2013, Christy filed a petition for dissolution of marriage. On October 17, 2018, the circuit court entered an order noting the parties' partial agreement with regard to distribution of the marital property. The circuit court attached to its order a property division report, which revealed that the parties had agreed to a property settlement allocating approximately $3 million to each party, accounting for a $471,500 equalization payment from James to Christy.

¶ 5     Pursuant to the agreed property division, James received real estate with equity totaling $915,000; cash and investments totaling $51,053; interest in Bel-O Sales and Service, Inc. (Bel-O Sales) valued at $2,102,750; interest in Bel-O Pest Solutions, Inc. (Bel-O Pest) valued at $175,000; a cell tower lease valued at $7000; cars and personal effects valued at $26,100; life insurance valued at $54,009; retirement accounts valued at $381,515; and debts totaling $233,865. Pursuant to the agreed property division, Christy received real estate with equity totaling $1,041,130; cash and investments totaling $818,442; cars and personal effects valued at $66,000; life insurance valued at $168,161; and retirement accounts valued at $442,072.

¶ 6     On October 18, 2018, at the hearing on the remaining issues, including child support and maintenance, James testified that he and Christy had four children: Alexis, age 20, Jack, age 18, Joe, age 16, and Anna, age 13. James testified that his father started

2

Bel-O Sales, a heating, air-conditioning, and plumbing company, and that he had been employed by Bel-O Sales since 1980. James testified that he became a shareholder in 1995 and owned 90% of the shares. James testified that when he acquired Bel-O Sales in 1995, it grew from $3 million in gross sales to $8 or $9 million in gross sales. James testified that in 2008, however, commercial construction halted and negatively affected the whole business.

¶ 7    James testified that he also owned 51% of the shares of Bel-O Pest, a pest control and solutions company, which began in 2005. James testified that Bel-O Sales and Bel-O Pest were Subchapter S corporations and were, in effect, pass-through entities for which he and Christy paid taxes. Accordingly, James testified that Bel-O Sales maintained investment accounts and that ordinary dividends passed through as income to him.

¶ 8    James testified that Bel-O Sales held $600,000 to $700,000 in cash reserve accounts for bonding purposes, *i.e.*, to acquire bonds for large commercial projects. James explained that to acquire a large commercial project opportunity, a bond is required, and in order for Bel-O Sales to be bonded, a bonding company reviewed financial statements for profit and ability to pay, in case of failure to complete a project. James testified that generally an insurance audit team reviewed the financial statements and determined a bonding rate based on the company's capability to repay a loan or bond. James testified that although there was no explicit bonding threshold or mark for cash reserves, strong cash reserves resulted in a lower bonding rate. James testified that when the company failed to show a profit, the cash reserves were mandatory to even acquire a bond. James testified that the cost of a bond depended on the cost of the project and that

3

Bel-O Sales paid "so many dollars per thousand." James testified that the $600,000 to $700,000 in cash reserves was also necessary given that the company's payroll amounted to about $85,000 per week.

¶ 9 James testified that he had in the past withdrawn funds and paid bonuses when the business hit profits over budget for that quarter. James testified, however, that Bel-O Sales had not met targets for any quarter since 2013 and that, since 2012, he had not accessed funds to pay bonuses or dividends to himself or any other shareholder. James testified that each October, his business consultant prepared a written budget for the following year by reviewing with department managers the obtainable sales goals and budget targets. James testified that he had not adjusted that budget to increase targets to limit his payment of child support and maintenance.

¶ 10 On November 7, 2018, the circuit court entered a judgment of dissolution of marriage. In its order, the circuit court noted and memorialized the parties' agreement regarding the disposition of the majority of marital property and noted that the parties had reserved to the court's determination the issues of maintenance, child support, medical expenses, health and life insurance, post-majority college support, and dissipation.

¶ 11 On December 14, 2018, the circuit court entered a supplemental judgment of dissolution of marriage. The circuit court determined that James's annual income totaled $167,842.25, which included $131,700 W-2 income, $2400 director fees, $5951 cell tower rental, and $27,791 dividends from investments held by Bel-O Sales. This dividend amount represented the average of James's 2016 and 2017 qualified and unqualified

4

dividend income as represented on his Schedule K-1 forms, which reported his share as partner of income, deductions, and credits of the business.

¶ 12 The circuit court found that Christy was awarded a total of $1,136,535 in cash from the parties' existing investment accounts, as well as a lump sum cash settlement of $471,500. The court noted that Christy had argued that her cash property settlement should not be considered as income. However, citing *In re Marriage of Rogers*, 213 Ill. 2d 129, 136-37 (2004) (definition of income is broad, includes gains and benefits that enhance wealth, and is linked to investments), the circuit court applied 6.5% to $950,000 of the cash assets awarded to Christy, to determine interest income of $61,750 annually. Applying the guidelines of section 504 of the Illinois Marriage and Dissolution of Marriage Act, the court awarded Christy monthly maintenance of $2507.25. The circuit court awarded child support of $1605 per month.

¶ 13 On January 18, 2019, the circuit court entered an order disposing of the issues remaining subsequent to the December 14, 2018, order. On January 30, 2019, Christy filed a notice of appeal.

¶ 14                                     II. ANALYSIS

¶ 15 On appeal, Christy argues that the circuit court erred as a matter of law in considering interest income on her share of the marital property for purposes of maintenance and child support. Christy states that she "does not claim that the finding as to [James]'s income was an abuse of discretion[ ] or that the finding as to her income was an abuse of discretion." Christy argues that the method the circuit court used to calculate each party's income was inequitable.

5

¶ 16 The circuit court's determination in awarding maintenance and child support is presumed to be correct. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 292 (2010). The circuit court's findings as to net income and its awards for maintenance and child support lie within its sound discretion and will not be disturbed on appeal absent an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005) (maintenance); *In re Marriage of Moorthy*, 2015 IL App (1st) 132077, ¶ 41 (child support); *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 22 (child support). The trial court abuses its discretion if "no reasonable person would take the trial court's view." *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 233 (2008).

¶ 17 Pursuant to section 504(a) of the Illinois Marriage and Dissolution of Marriage Act, the circuit court, in deciding whether to grant a maintenance award, considers, *inter alia*, the income and property of each party, including marital property apportioned, and nonmarital property assigned to the party seeking maintenance. 750 ILCS 5/504(a) (West 2018). Likewise, pursuant to section 505(a)(1)(F), the Illinois Department of Healthcare and Family Services' rules establishing child support guidelines have the purpose of, *inter alia*, allocating the amount of child support to be paid by each parent based upon a parent's net income and the child's physical care arrangements. 750 ILCS 5/505(a)(1)(F) (West 2018); see also *In re Marriage of Rogers*, 213 Ill. 2d at 136-37 (income includes money received from investments); *In re Marriage of Mayfield*, 2013 IL 114655, ¶ 16 (income includes gains and benefits that enhance a noncustodial parent's wealth and facilitate parent's ability to support children, which are normally linked to employment, investments, royalties, and gifts).

6

¶ 18    Here, the circuit court found Christy's income to be $61,750 annually based upon application of a reduced 6.5% rate of return to a portion, $950,000, of the cash assets awarded to her. Although the evidence revealed that the historical interest rate on the Edward Jones Living Trust Account was 9.93%, the circuit court applied a reduced rate of return of 6.5% to $950,000 in cash assets to allow Christy to pay off the $44,000 debt encumbering her recently-purchased vehicle, in addition to other debts. The circuit court found James's income to be $167,842.25 annually, which included $131,700 in W-2 income, $2400 in director fees, $5,951.25 in cell tower rental income, and $27,791 in dividends from investments held by Bel-O Sales.

¶ 19    Christy argues that the $600,000 to $700,000 in cash retained by Bel-O Sales is "earning money" from which the circuit court should have imputed income to James, considering that it imputed interest income to her. We find no abuse of discretion, however, in the circuit court's implicit determination, pursuant to the facts in evidence, that "[i]t is sometimes necessary for a corporation to retain profits in order to secure its continued existence and appropriate capitalization to meet ongoing business necessities." See *In re Marriage of Moorthy*, 2015 IL App (1st) 132077 (courts should engage in a case-by-case, fact-specific analysis to determine whether retained earnings of a corporation should be imputed to the majority shareholder for purposes of calculating child support). Moreover, as noted in the circuit court's supplemental judgment, the circuit court considered interest income received by both parties. Specifically, the circuit court considered as income for James $27,791 in qualified and unqualified dividends

7

from investments held by Bel-O Sales. Thus, Christy's suggestion that the circuit court failed to consider James's interest income is erroneous.

¶ 20    Further, despite Christy's contention on appeal that considering interest income from marital property awarded her is improper "double counting" of her assets, the circuit court may properly consider investments when determining income for child support and maintenance purposes. See 750 ILCS 5/504(a), 505(a)(1)(F) (West 2018); *In re Marriage of Rogers*, 213 Ill. 2d at 136-37; *In re Marriage of Mayfield*, 2013 IL 114655, ¶ 16; *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 656 (2008). The cases cited by Christy to argue against "double counting" marital property are inapposite. See *In re Marriage of Talty*, 166 Ill. 2d 232, 236-37 (1995) (remand was required for trial court to determine whether consideration of goodwill in valuing husband's business resulting in impermissible double counting of its value, first when considered as part of the business value and again later in the division of marital assets, thereby overstating property assigned to husband); *In re Marriage of Zells*, 143 Ill. 2d 251, 256 (1991) (goodwill is appropriately considered as an aspect of income potential then reflected in maintenance and support awards, and any additional consideration of goodwill value is duplicative and improper).

¶ 21    As noted by James, the circuit court acted within its discretion in including interest income for Christy's cash assets, charging her two-thirds of the historical rate of return and including only a portion of the cash assets she received, and in including as income the actual returns James received on his Bel-O Sales investments for 2016 and 2017. Accordingly, we reject Christy's contentions on appeal. See *In re Marriage of Moorthy*, 2015 IL App (1st) 132077, ¶ 65 (noting that father had done nothing to manipulate his

income to minimize his child support obligations, reviewing court held that trial court did not abuse its discretion in determining that the father's proportionate share of the retained earnings from his majority-owned subchapter S corporation should not be imputed to him to calculate child support obligations). We find no abuse of discretion in the circuit court's calculations of Christy's and James's income or in the circuit court's awards of child support and maintenance.

¶ 22                                III. CONCLUSION

¶ 23    For the reasons stated, we affirm the judgment of the circuit court of St. Clair County.

¶ 24    Affirmed.