2020 IL App (1st) 181916-U

No. 1-18-1916

FIRST DIVISION
June 8, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Domestic Relations Division. |
| JENNIFER SAN JOSE, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 13 D 9754 |
| | ) | |
| GEORGE SAN JOSE, | ) | Honorable |
| | ) | John Thomas Carr, |
| Respondent-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE GRIFFIN delivered the judgment of the court.
Justices Hyman and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's finding that the marital estate was entitled to reimbursement for certain contributions made to the non-marital estate was against the manifest weight of the evidence. We reverse that portion of the trial court's judgment and affirm the judgment in all other respects.

¶ 2    Jennifer San Jose petitioned the trial court to dissolve her 14-year marriage to George San Jose. The matter proceeded to a trial. The trial court dissolved the marriage, awarded Jennifer maintenance and 75% of the marital estate, and ordered George to reimburse the marital estate for contributions made to his non-marital estate. George appeals, and claims the trial court's judgment

is fraught with errors and reversible in several respects. For the following reasons, we affirm in part and reverse in part.

¶ 3                                I. BACKGROUND

¶ 4     Jennifer and George were married on December 5, 1998. They had two children, a boy and a girl, and lived at a home in Winnetka during their marriage. George was the breadwinner of the family. He was the chief executive officer and sole shareholder of The San Jose Group, an advertising company he founded in 1981. Jennifer worked as an employee at George's company and was the primary caregiver for the parties' children. The marriage lasted for 14 years and 11 months.

¶ 5     On November 13, 2013, Jennifer filed a petition in circuit court of Cook County alleging that irreconcilable differences had caused an irretrievable breakdown in the parties' marriage. Jennifer asked the trial court to dissolve the marriage and distribute the marital assets between the parties. She also sought an award of maintenance and asked the trial court to grant her custody of the minor children. The parties proceeded to trial on May 11, 2016.

¶ 6     Jennifer met George at church in 1998. At the time, she was a church employee earning $8 per hour. The parties were married on December 5, 1998 and shortly thereafter, Jennifer went to work for George at his advertising company. Jennifer testified that she earned a salary of $45,000 per year working for George. In 2014, around the time she filed for divorce, Jennifer worked for Integra Communications making around $13 per hour. In May of 2016, she worked for "Abiding Care" as a part time employee earning $17.50 per hour.

¶ 7     George testified that he was the sole owner and chief executive officer of The San Jose Group; an advertising company that specialized in television, radio and other print advertising. George started the company with a partner in 1981 and became its sole shareholder in 1998.

Between 2005 and 2010, the company had 55 employees. In 2015, the company had between 10 and 12 employees. In 2016, the number of employees was reduced to two. As of June 21, 2017, George was the company's only employee. George testified that the company was experiencing a "downturn" and that he considered dissolving it.

¶ 8     When asked whether he had sought other employment, George gave the following answer: "[n]ot at this point. I want to get the divorce finalized. It's been dragging on far too long. Then I have to figure out what I'm going to do and how I'm going to support myself and my children." George further testified that he was "pursuing clients," but "not really" working full time at his business.

¶ 9     The parties filed joint tax returns in tax years 2011 through 2015. The returns were introduced and admitted into evidence. Jennifer reported the following wage earnings in tax years 2011, 2012, 2013, 2014 and 2015: $99,600, $49,540, $0, $37,971, and $9,335. In 2016, Jennifer earned $15,663.79 in wages. George reportedly earned the following wages in the same tax years: $310,600, $37,141, $49,540, $0 and $0. In addition to wage income, George reported dividend income from The San Jose Group and other sources.

¶ 10     George's dividend income from The San Jose Group for tax years 2011, 2012, 2013, 2014 and 2015 totaled: $26,906, $25,905, $86,700, $78,000, and $78,000. George reported the following dividend income from other sources in the same tax years: $22,197, $25,421, $19,028, $17,749, and $24,487. George claimed to have earned $78,000 in dividends from the San Jose Group and $26,671 in dividends from other sources in 2016.

¶ 11     The corporate tax returns of The San Jose Group were introduced and admitted into evidence at trial. The company reported the following income during tax years 2011, 2012, 2013, 2014, and 2015: $106,705, $648,332, $0, $0, and $29,559. In 2013, 2014 and 2015, the company

executed loans in favor of George in the following amounts: $78,000, $11,000 and $78,000. The corporate tax return for 2016 was not introduced into evidence.

¶ 12    George and Jennifer both had profit-sharing plans with The San Jose Group. At the time of trial, George's plan had a value of $1,156,372.02. George testified that he participated in the plan prior to the parties' marriage and at the time of trial his "non-marital" portion of the plan totaled $396,000. George also maintained health and life insurance policies for the benefit of the family during the marriage. The cost to maintain the health insurance policy was $2,073 per month. The costs of the "Banner" and "Met Life" term life insurance policies totaled $960 and $764 per month, respectively. According to George, when he attains the age of 66 the Banner policy premium will increase to $21,125. The Met life premium will increase to $9,609 at the age of 62. George was 59 years old at the time of trial and Jennifer was 50.

¶ 13    In 2003, George purchased a home on Woodley Road in Winnetka (Woodley Property) for $2,390,000. Thereafter, the Woodley Property served as the family residence throughout the parties' marriage. George testified that he purchased the home with "premarital funds" and claimed he paid the earnest money with funds from a "money market account" that predated the marriage.

¶ 14    The Woodley Property underwent substantial renovations during the parties' marriage. A pool was built in the backyard and every room in the house was remodeled. George testified that he paid for the renovations with funds from his "money market account." According to George, the renovation costs totaled $700,000. Jennifer estimated the renovation costs at $1,000,000. However, she did not know what funds were used to pay for the renovations. No documentary evidence was presented to support the parties' testimony as to the value of the Woodley Property or the cost of the renovations.

¶ 15    George opined that the value of the Woodley Property was "the same [he] bought it for" in 2003. As the basis for his opinion, George testified that a similar home across the street had recently been sold for $2,395,000. He claimed the real estate in the area had not increased in value since 2003. Jennifer estimated the value of the Woodley Property at "2 million," but provided no basis for her estimation. Neither party presented evidence of the Woodley Property's appraised value.

¶ 16    The parties purchased a second home in Oostburg, Wisconsin, during the marriage (Wisconsin Property). Real estate appraiser David Holzhaur testified that the appraised value of the home was $1,200,000. Both parties testified that the Wisconsin Property was remodeled. George claimed he used premarital funds to complete the remodeling and maintain the property.

¶ 17    Jennifer testified that she took some gold coins from George's safe and used them to put a deposit on a townhome. Jennifer claimed to have taken "less than half" of the coins but failed to produce an accounting at trial. George testified that he purchased 41 gold coins in October 9, 1998 and kept them in his safe at the Woodley Property. The coins had a value of $53,300.

¶ 18    The trial concluded and the trial court entered a judgment for dissolution of marriage on March 27, 2018. The trial court found that an award of maintenance was appropriate and ordered George to pay Jennifer $4,305 per month for 107.5 months. The trial court imputed income to the parties and based its maintenance calculation on 35% of George's income and 20% of Jennifer's income. It found that George was in the position to earn $152,072 a year and an additional "$50,000 in addition to the dividend and other monies." Jennifer's gross income was $24,000 per year. The additional $50,000, however, was excluded from the trial court's calculation of maintenance.

¶ 19    The trial court divided the marital estate by awarding 75% to Jennifer and 25% to George. The Woodley Property was valued at $3,382,500 and classified as George's non-marital property. The trial court found that the renovations to the Woodley Property ($882,500), the earnest money for the property ($75,500) and the mortgage payments made during the marriage ($552,930) were contributions to George's non-marital estate for which reimbursement was required. George was ordered to pay the marital estate $1,510,930.

¶ 20    The trial court classified the Wisconsin Property as a marital asset and found that it had a value of $1,200,000. The parties were ordered to sell the property and divide the proceeds, 75% to Jennifer and 25% to George. Jennifer was guaranteed $900,000 from the sale of the property. George was given the right of first refusal and could buy the property from Jennifer for the same amount. However, the trial court reconsidered its decision and modified its judgment for dissolution of marriage in an order entered on August 22, 2018.

¶ 21    In its order of August 22, 2018, each party was given the right to buy each other's interest in the property. Jennifer's interest was valued at $900,000 and George's interest was valued at $300,000. If neither party exercised the buy-out option, the Wisconsin Property was to be sold and the "net proceeds" split between the parties, 75% to Jennifer and 25% to George.

¶ 22    The parties profit-sharing plans were valued at $1,249,930 at the time of trial. The trial court ordered each party to retain their profit-sharing plan. The marital portions of the plans were to be divided out and shared between the parties, 75% to Jennifer and 25% to George. The trial court required George to maintain his term life insurance policies and his whole life insurance policy. George was obligated to maintain the cash value of the whole life policy and name Jennifer as a beneficiary for $500,000. Both parties were responsible for their own health insurance and other medical expenses.

¶ 23    The trial court found that Jennifer took 14 gold coins from George's safe and used them as temporary support. The 41 gold coins in the safe were found to be non-marital property with a value of $53,300. Finally, George was ordered pay $1,100 in child support per month.

¶ 24    Both Jennifer and George filed motions to reconsider on April 26, 2018. George challenged the trial court's order on several fronts, but mainly argued that the trial court erred in calculating the maintenance award and that its division of the marital estate was inequitable. On August 22, 2018, the trial court entered a written order granting in part and denying in part both motions to reconsider. George appeals, and claims the trial court made several errors that warrant the reversal of its judgment.

¶ 25                                    II. ANALYSIS

¶ 26                                   A. Maintenance

¶ 27    Section 504 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/504 (West 2018)) (Act) provides that "the court may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct, and the maintenance may be paid from the income or property of the other spouse." Before granting such an award, the court must consider the factors set out in section 504(a) of the Act (*Id*. § 504(a)) and find that maintenance is appropriate. The propriety of a maintenance award is a matter that lies within the sound discretion of the trial court. *In re Marriage of Selinger*, 351 Ill. App. 3d 611, 614 (2004).

¶ 28    George claims that an award of maintenance was not appropriate in this case. However, he told the trial court in closing argument that "[t]here is no question [Jennifer] is entitled to maintenance." George's motion to reconsider follows suit and claims only that the amount of maintenance awarded was incorrect. Issues raised for the first time on appeal are forfeited. *In the*

*Matter of Chance H.*, 2019 IL App (1st) 180053, ¶ 45. Accordingly, George forfeited his argument that an award of maintenance was not appropriate.

¶ 29                                 ii. *Imputed Income*

¶ 30    George challenges the trial court's calculation of the maintenance award as improperly based on imputed income. He claims the trial court imputed too much income to him and not enough income to Jennifer, and argues that absent from the record is any finding of voluntary underemployment.

¶ 31    When calculating an award of maintenance, a trial court may impute income to the parties if: (1) the payor has become voluntarily unemployed; (2) the payor is attempting to evade a support obligation; or (3) the payor has unreasonably failed to take advantage of an employment opportunity. *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 30. Voluntary underemployment may also warrant an imputation of income. *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39. The amount of income imputed by the court must be based on evidence showing that it is commensurate with the payor spouse's skills and experience. See *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 46. In determining a party's earning capacity, a court should only consider evidence presented, not mere speculation. *Id*.

¶ 32    A trial court's decision to impute income is reviewed for an abuse of discretion, which occurs when no reasonable person could find as the trial court did. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 43; *In re Marriage of Breashears*, 2016 IL App (1st) 152404, ¶ 15. If a party challenges a trial court's factual findings regarding maintenance, we will not reverse them unless they are against the manifest weight of the evidence. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30. A finding is against the manifest weight of the evidence where the opposite

conclusion is clearly evident or the findings are unreasonable, arbitrary, and not based on any of the evidence. *Id.*

¶ 33    A finding of voluntary underemployment was implicit in the trial court's decision to impute income to George. At trial, George testified he was "not really" working full time in his business. When asked whether he had sought other employment, George gave the following answer: "[n]ot at this point. I want to get the divorce finalized. It's been dragging on far too long. Then I have to figure out what I'm going to do and how I'm going to support myself and my children." Based on this testimony, we also conclude that the trial court's implicit finding was not an abuse of discretion. *In re Marriage of Koenigsknecht,* 302 Ill. App. 3d 474, 479 (1998) (an abuse of discretion will be found only when no reasonable person could find as the trial court did).

¶ 34    George claims the trial court erred when it found that he was in the position to earn $152,072 per year and "$50,000 in addition to the dividend and other monies." We note that the trial court calculated the maintenance award using only George's imputed income of $152,072. The additional $50,000 was excluded.

¶ 35    The trial court's factual finding was not against the manifest weight of the evidence. The record establishes that George was an advertising executive with valuable skills and experience. Before he started The San Jose Group in 1981, George worked for "Spanish Advertising and Marketing Services" in New York City, a company he described as the "largest and most prestigious" advertising agency. George testified that he knew the "wholesale industry intimately," and that this knowledge was valuable. In 1998, George purchased his partner's interest in The San Jose Group and became its sole shareholder. George's personal and corporate income tax returns indicate that he has the ability to earn income from various sources. Also pertinent to the analysis

9

is George's testimony that he was "not really" working full time and waiting for the divorce proceeding to come to an end.

¶ 36    Based on these facts and the record as a whole, we conclude the trial court did not base its determination on speculation or impute an amount of income to George that was not commensurate with his earning capacity, skills and experience. The trial court's factual finding had a basis in the record and it was not against the manifest weight of the evidence. *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 3.

¶ 37    George claims the trial court did not impute enough income to Jennifer because she could work more hours and earn $35,000 a year. The record establishes that Jennifer had earned $8 per hour at a church. Jennifer worked for George's advertising company during the parties' marriage and after she filed for divorce, she was temporarily employed as an account executive earning $13 per hour. In 2016, Jennifer secured part-time employment and made $17.50 dollars per hour working 30 hours a week. Based on these facts and the record evidence of Jennifer's earning capacity, skills and experience, we conclude that the trial court's factual finding was not against the manifest weight of the evidence. *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 3.

¶ 38                    ii. *Deviation from the Statutory Guidelines*

¶ 39    Section (b-1)(1) of the Act (750 ILCS 5/504(b-1)(1) (West 2018)) sets forth the guidelines for calculating maintenance. At the time of trial, the guidelines provided that "[t]he amount of maintenance *** shall be calculated by taking 30% of the payor's gross annual income minus 20% of the payee's gross annual income." *Id*. § 504(b-1)(1)(A). The guidelines further provided that "[t]he amount calculated as maintenance, however, when added to the gross income of the payee, may not result in the payee receiving an amount that is in excess of 40% of the combined gross income of the parties." *Id*. A court has the discretion to deviate from the guidelines and may do so

if it finds that applying them under the circumstances would be inappropriate. 750 ILCS 5/504(b-1)(1) (West 2018); *In re Marriage of Hill*, 2015 IL App (2d) 140345, ¶ 28. The court must support its decision with express reasoning. *Id*. § 504 (b-2)(1), (2).

¶ 40 The trial court in this case deviated from the statutory guidelines. It calculated maintenance based on 35% of George's income and 20% of Jennifer's income, and did not apply the 40% statutory cap. As provided in the judgment for dissolution of marriage, the trial court expressly considered the relevant factors (see 750 ILCS 5/504(a) (West 2018)) and deviated from the guidelines on account of the length of the parties' marriage, in order to compensate Jennifer for the standard of living that was established during the marriage, and based on Jennifer's income and George's ability to earn income. See *Id*. § 504(a)(1), (7), (8).

¶ 41 George claims the trial court had no basis for deviating from the guidelines and it should have applied the statutory 40% cap. He further contends that the trial court "did not properly take into account" his obligation to maintain multiple life insurance policies when it deviated from the guidelines and failed to consider "the amount and duration of the temporary maintenance payments made" to Jennifer.

¶ 42 We find the trial court's decision to deviate from the guidelines was not an abuse of discretion. First, George's argument hinges in large part on what he claims was the trial court's purported baseless decision to impute income to the parties. We already decided this issue and that decision applies equally here. Second, the trial court's decision not to apply the 40% cap was part and parcel of its decision to deviate from the guidelines and not *ipso facto* an abuse of discretion.

¶ 43 Third, the trial court's alleged failure to "account" for the cost of maintaining the life insurance policies is not a basis for reversing its decision. We presume the trial court considered and accounted for the policy increases when it awarded maintenance. *In re Marriage of Lugge*,

2020 IL App (5th) 190046, ¶ 15 ("a trial court's determination in awarding maintenance is presumed to be correct"). This presumption also applies to George's contention that the trial court did not consider the temporary maintenance payments made to Jennifer.

¶ 44    We further presume the trial court considered the temporary maintenance payments when it deviated from the guidelines and decided not to reduce the duration of maintenance. *Id*. In total, George has failed to persuade us that no reasonable person would have deviated from the statutory guidelines in the way the trial court did here. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 650 (2008).

¶ 45    George briefly contends that the trial court erred in calculating child support. 705 ILCS 5/505 (West 2018). The trial court found that Jennifer was entitled to $1,100 per month in child support instead of $1,600 per month under the guidelines. *Id*. The trial court's decision reflects a downward deviation from the statutory child support guidelines. *Id*. As outlined in the judgment for dissolution of marriage, the trial court expressly considered the relevant factors and deviated downward based on: (1) the disproportionate share of the marital estate; and (2) its belief that Jennifer will earn income on the money she receives from the marital estate. George's argument here is wholly dependent on the outcome of an issue we already resolved against him: whether the trial court abused its discretion when it imputed income to both parties. Accordingly, George's argument must fail.

¶ 46                            C. Division of the Marital Estate

¶ 47    Section 503(d) of the Act requires a court to consider twelve statutory factors and "divide the marital property without regard to marital misconduct in just proportions." 705 ILCS 5/503(d) (West 2018). The test of proper apportionment of marital property is whether it is equitable and each case rests on its own facts. *In re Marriage of Coviello*, 2016 IL App (1st) 141652, ¶ 28. A

trial court's distribution of marital assets will not be disturbed unless the court clearly abused its discretion. *Id.*

¶ 48    The marital estate in this case was divided as follows: 75% to Jennifer and 25% to George. The trial court found the total value of the marital estate was $2,890,398. Jennifer received $2,167,791 and George's share totaled $772,597.25. The value of the George's non-marital estate totaled $5,000,000.

¶ 49    As provided in the judgment for dissolution of marriage, the trial court expressly considered the relevant factors (see 705 ILCS 5/503(d) (West 2018)) and based its decision in part on: (1) the needs of the parties: (2) Jennifer's ability to earn income; (3) the parties' income and assets; (4) the standard of living and lifestyle "close to [George's] which Jennifer will never be in a position to obtain"; and (5) George's non-marital assets.

¶ 50                                  i. *Consideration of the Statutory Factors*

¶ 51    George argues generally that the trial court failed to consider the statutory factors when it divided the marital estate. He concludes that the division of the marital estate is inequitable and must be reversed. We reject this argument. The trial court's consideration of the relevant factors is reflected in the text of the judgment for dissolution of marriage and in its myriad decisions.

¶ 52    George turns and focuses his argument on specific statutory factors, claiming the trial court: (1) did not consider whether the apportionment was in lieu of or in addition to the maintenance award (see 705 ILCS 5/503(d)(10) (West 2018)); (2) disregarded his contribution to the value and preservation of the Wisconsin Property (see *Id.* § 503(d)(1)); (3) did not take into account his age, employment skills, the trajectory of his business and his "actual income" (see *Id.* § 503(d)(8)); and (4) failed to address the custodial provision for the minor children (see *Id.* § 503(d)(9)).

13

¶ 53    Based on the record, we find it clear that the trial court awarded maintenance in addition to a 75% share of the marital estate, addressed the custodial provision for the minor children and properly took into account George's age, employment skills and the trajectory of his business and income. Insofar as George's argument is based on his disagreement with the amount of income imputed to him by the trial court, we outright reject it. Important here is the disparity between Jennifer and George's assets. Jennifer had no non-marital assets. George's non-marital assets totaled $5,000,000. It is well settled that a trial court is justified in awarding almost all of the marital property to one spouse if the other spouse has substantial nonmarital assets. *In re Marriage of Gattone*, 317 Ill. App. 3d 346, 355 (2000).

¶ 54    Furthermore, George was the chief executive officer and sole owner of an advertising company. Though he was 59 at the time of trial, the record contains no indication that he was unable to work. In fact, the record shows that George had several streams of income. Jennifer, on the other hand, had significant health issues, mounting medical expenses and an earning capacity of $24,000 per year. The trial court specifically found that Jennifer would never be in a position to maintain the lifestyle and standard of living that was established during the marriage.

¶ 55    George claims the trial court disregarded his contribution to the value and preservation of the Wisconsin Property. However, if George contributed more than Jennifer to the Wisconsin Property, it was because he had the financial means to do so. Being the breadwinner of the family and contributing more to the marital estate on a financial level does not automatically result in a greater share of the marital assets. *In re Marriage of Scoville*, 233 Ill. App. 3d 746, 758 (1992). Indeed, "[i]n a long-term marriage, the source of the assets in acquiring marital property becomes less of a factor, and a spouse's role as the homemaker becomes greater." *Id*. The record establishes

that Jennifer was the primary caretaker to the children and the marriage spanned more than 14 years. Accordingly, George's financial contributions do not carry all the weight.

¶ 56    Overall, we are unpersuaded by George's contentions and decline to reverse the trial court's division of the marital estate. The trial court thoughtfully considered the relevant factors and based its decision on the totality of the evidence in the record. The trial court did not abuse its discretion. *In re Marriage of Stufflebeam*, 283 Ill. App. 3d 923, 929 (1996).

¶ 57                    ii. *Tax Consequences of the Wisconsin Property Division*

¶ 58    George claims the trial court failed to consider the tax consequences of the division and sale of the Wisconsin Property. See 705 ILCS 5/503(d)(10) (West 2018) (requiring a court to consider "the tax consequences of the property division upon the respective economic circumstances of the parties"). George asserts that the Wisconsin Property was an investment property from which depreciation deductions were taken for several years. George claims that upon the sale of the Wisconsin Property, there will be capital gains tax assessed and the Internal Revenue Service will claw back the depreciation deductions.

¶ 59    As Jennifer argues, George did not raise this argument in the trial court. In his motion to reconsider, George focused only on the "Wisconsin Property Expenses" and sought a credit for "$43,000 in taxes and upkeep" that he allegedly paid with "premarital funds." George did not ask the trial court to reconsider its division of the Wisconsin Property on the basis that it failed to consider the potential tax consequences of a sale. Because George raised this argument for the first time on appeal, it is forfeited. See *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 85 (issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal).

¶ 60                                    iii. *Profit Sharing Plans*

¶ 61    George claims that a portion of his profit-sharing plan was non-marital and the trial court erred when it failed to exclude it from the marital estate. As proof for his contentions, George points to his own testimony at trial. George claims his testimony shows that the profit-sharing plan commenced in 1993, the value of his interest "[a]s of the date of marriage to [Jennifer]" was $182,840 and at the time of trial, the value was $396,000. Because this testimony was allegedly "unimpeached and uncontradicted," George argues that the trial court was required to accept it as fact and rule accordingly.

¶ 62    Retirement benefits earned during the marriage in the form of profit-sharing interests are designated as marital property. *In re Marriage of Davis*, 215 Ill. App. 3d 763, 773 (1991). The marital portion of a profit-sharing interest, calculated by the ratio of years of accumulation during marriage to the total years of accumulation, should be divided between the spouses upon dissolution. *Id.*; *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 663 (1979) (providing a formula for calculating the marital portion of a pension or profit-sharing plan).

¶ 63    The trial court here found that the parties' profit-sharing plans totaled $1,249,930 at the time of trial. The plans were to be divided using the *Hunt* Formula (see *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 663 (1979)) and Jennifer was to receive 75% of the "marital portion" of the plans as of March 27, 2018. George was to receive 25% of the marital portion of the plans.

¶ 64    George asserts that his non-marital portion of his profit-sharing plan was $182,840 "[a]s of the date of marriage to [Jennifer]." However, as support for his claim, George cited to a document in the record with a date of March 31, 2001, which was two years into the parties' marriage. This document would seem to contradict George's "unimpeached and uncontradicted" testimony such that the trial court was well within its bounds to question it. *Sweilem v. Illinois*

16

*Department of Revenue*, 372 Ill. App. 3d 475, 485 (2007) (a fact finder may discount witness testimony if it was impeached, contradicted by positive testimony or by circumstances, or found to be inherently improbable).

¶ 65    We find that the trial court's decision here turned on a credibility determination (that was not in George's favor). We defer to such determinations and further reject George's argument because he has failed to turn our attention to documentary evidence in the record indicating that the trial court's division of the profit-sharing plans was against the manifest weight of the evidence. *In re Marriage of Cerven*, 317 Ill. App. 3d 895, 903 (2000).

¶ 66                                    iv. *Life Insurance Policies*

¶ 67    George claims the trial court abused its discretion when it required him to maintain his term life insurance policies and retain cash value of his whole life insurance policy. We disagree. The trial court ordered each party to retain the cash values of their respective life insurance policies and as Jennifer argues, its order sought to ensure that the security for George's obligations under the judgment for dissolution of marriage was not depleted. Once George's obligations to Jennifer and the children are satisfied, he is free to remove Jennifer as a beneficiary of his policy. We are not persuaded that no reasonable person would have adopted the view taken by the trial court here. *In re Marriage of Ward*, 267 Ill. App. 3d 35, 41 (1994).

¶ 68            v. *Predistributions and the "North Side" Checking Account*

¶ 69    The trial court ordered George to make two predistribution payments to Jennifer in the amount of $20,000 each. The orders were entered on June 30, 2017, and November 16, 2017. George complains that a credit for these payments is not reflected in the judgment for dissolution of marriage ("George paid said amounts and should properly be given credit in the final division of the marital estate"). However, George has not turned our attention to any requirement that a

credit be automatically given for predistributions from the marital estate and has offered no explain as to why the trial court's decision not to credit him for the payments was an abuse of discretion. *In re Marriage of Winne*, 239 Ill. App. 3d 273, 280 (1992). In light of these failures George's argument must be rejected.

¶ 70 George next argues that the trial court erred when it found the value of the parties' "North Side" joint checking account was $17,484. In support of his argument, George turns our attention to "Respondent's trial exhibit 8a," which he claims is a document that proves the trial court's factual finding was "erroneous." We remind George that Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018) requires him to cite, not to the exhibits presented at trial, but to the section of the appellate record where those exhibits can be found. A reviewing court is not a repository into which an appellant may foist the burden of argument and research. *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). In any event, our review of the record has sufficiently illuminated the issue before us.

¶ 71 In his motion to reconsider filed in the trial court, George explained that the balance of the checking account "as of March 31, 2016, was in fact $17,484." He went on to state that an updated statement was provided to the trial court which reflected a balance of $7,488.69 as of May 31, 2017. At the hearing on the parties' motions to reconsider, the trial court indicated that it "picked a figure that *** would be reasonable to be assigned to that account" based on the evidence that various amounts were taken out of the account by the parties from time to time. George failed to turn our attention to these facts and given that his argument fails to account for what happened between March 31, 2016 and May 31, 2017, we cannot reverse the trial court's finding as against the manifest weight of the evidence.

¶ 72                                  vi. *Retained Earnings*

¶ 73    George claims that the trial court artificially inflated the value of The San Jose Group's retained earnings. George bases his argument on the testimony of his expert witness, Gerald Catalano, who indicated at trial that only $199,000 of the retained earnings consisted of cash. We note that Catalano went on to testify that "in this case are some cash and a lot of furniture and fixtures and some receivables and some investments." But to the point, George's argument fails to explain how the trial court's purported miscalculation of the retained earnings rendered its division of the marital estate an abuse of discretion. We will not make the argument for him. *In re Marriage of Winne*, 239 Ill. App. 3d 273, 280 (1992).

¶ 74                              D. Valuation of the Woodley Property

¶ 75    George argues that the trial court erred when it valued the Woodley Property at $3,382,500. He claims the trial court was obligated to accept his testimony that the value of the property was "2.3 million" because it was "neither contradicted nor impeached." George further contends that the trial court erred in finding that the renovations to the Woodley Property totaled $882,500.

¶ 76    The valuation of marital property is generally a factual question, which will not be reversed unless it is against the manifest weight of the evidence. *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 75. In order to determine the value of marital assets, the court must have before it competent evidence of value. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 36. There is no rule of law regarding what type of evidence constitutes competent evidence of value, but the value of real estate is ordinarily proven through the testimony of expert witnesses who have conducted appraisals of the property at issue. *Id*.

¶ 77    At trial, George testified that he purchased the Woodley Property for $2,390,000 in 2003. He opined that the property's value remained unchanged at the time of trial in 2018. As the basis

for his opinion, George offered his own comparison of a property across the street, explaining the property was similar to the Woodley Property, purchased around the same time in 2003 and recently sold for $2,395,000. George presented no documentary evidence of this transaction or any evidence to support his estimation of the value of the Woodley Property. In his brief, George admits that "neither party appraised the Woodley home."

¶ 78    With regard to the renovations, George testified they totaled $700,000. When asked whether he had the "actual bills" for the renovations to the Woodley property, George gave the following answer: "I guess I have some at home." Jennifer testified that the renovation costs totaled $1,000,000 but she too failed to substantiate her claim with any documentation.

¶ 79    We reject George's argument that the trial court erred when it found the value of the Woodley Property was $3,382,500 and the renovation costs totaled $882,500. Contrary to his contentions, the trial court was free to disregard George's testimony as improbable and unworthy of belief. *Sweilem v. Illinois Department of Revenue*, 372 Ill. App. 3d 475, 485 (2007). Without any expert testimony establishing the appraised value of the Woodley Property or any documentary evidence substantiating the renovation costs, the trial court was left to resolve the parties competing testimony and place a value on the property it deemed appropriate. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 68 (it is the responsibility of the trial court to resolve conflicting evidence concerning the valuation of marital assets). Under these circumstances, we decline to reverse the trial court. The factual findings as to the value of the Woodley Property and the costs of renovation were not against the manifest weight of the evidence.

¶ 80    George briefly argues that the trial court failed to "award him all his non-marital property." This argument focuses on the furniture from the Woodley Property, but it is barely cognizable. We have reviewed the record and it shows that the trial court awarded George the "[f]urniture and

furnishings as listed in [his] 1998 Judgment for Dissolution of Marriage between [George] and his second wife." Furthermore, the parties resolved their dispute over the two chairs taken from the Wisconsin Property. Accordingly, George's argument is rejected.

¶ 81                              E. Reimbursement to the Marital Estate

¶ 82    Section 503(c)(2) of the Act provides a right to reimbursement for contributions made by one estate which have enhanced the value of an item of property classified as belonging to another estate. 750 ILCS 5/503(c)(2) (West 2018); *In re Marriage of Nelson*, 297 Ill. App. 3d 651, 657 (1998). However, "[n]o such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence or that was a gift." *Id*. § 503(c)(2)(A). "Tracing requires that the source of the funds be identified." *In re Marriage of Demar*, 385 Ill. App. 3d 837, 851 (2008) (quoting *In re Marriage of Davis*, 215 Ill. App. 3d 763, 770 (1991)). The burden of proof to establish that reimbursement is appropriate is on the party seeking reimbursement. *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 46. A trial court's determination that one estate of property is entitled to reimbursement from another estate will not be reversed unless it is against the manifest weight of the evidence. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 61.

¶ 83                              i. *Earnest Money and Renovations*

¶ 84    The trial court in this case ordered George to reimburse the marital estate for $75,500 in earnest money and $700,000 in renovations to the Woodley Property. The order reflects the trial court's implicit findings that the earnest money and renovations were contributions from the marital estate to the George's non-marital estate. George takes issue with these findings.

¶ 85    He claims Jennifer had the burden of demonstrating the marital estate's entitlement to reimbursement and that she failed to carry that burden by failing to present any tracing evidence at trial. Jennifer, on the other hand, claims that the funds used for the earnest money and

21

renovations were presumed to be marital property and George failed to rebut that presumption with clear and convincing evidence that the funds were non-marital property. See 750 ILCS 5/503(b)(b-1) (West 2018). Both parties admit that no tracing was done in this case. Neither party claims the earnest money and renovations were gifts.

¶ 86    We hold that Jennifer had the burden of proof and failed to identify the source of the funds at issue here. *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 46. Without a source Jennifer could not show by clear and convincing evidence that the earnest money for and renovations to the Woodley Property were marital contributions to George's non-marital estate. *In re Marriage of Demar*, 385 Ill. App. 3d 837, 851 (2008) ("Tracing requires that the source of the funds be identified"); 750 ILCS 5/503(c)(2)(A) (West 2018) ("[n]o such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence"). Jennifer failed to meet her burden of proof.

¶ 87    At trial, Jennifer presented no documents evidencing the source of the funds used to pay the earnest money or renovate the Woodley property. When asked if she knew where the money used to renovate the Woodley Property came from, Jennifer gave the following answer: "I don't know." George testified that he used funds from a non-marital "money market account" to renovate the property. However, he too failed to present any documentary evidence in support of his testimony. When explaining its findings after trial, the trial court indicated that it did not know the source of the earnest money ("I don't know where the money came from").

¶ 88    Accordingly, the trial court lacked an evidentiary basis for its determination that the earnest money and renovations to the Woodley Property were contributions to George's non-marital estate for which the marital estate was entitled to reimbursement. We reverse this part of the trial court's judgment.

¶ 89                                    ii. *Mortgage Payments*

¶ 90    George claims that the trial court erred when it ordered him to reimburse the marital estate for $552,930 in mortgage payments made during the marriage. Specifically, he argues that the marital estate was compensated by its use of the Woodley Property during the marriage such that reimbursement is not warranted. See *In re Marriage of Crook*, 211 Ill. 2d 437, 454 (2004) ("Illinois courts have previously held that a marital estate is not entitled to reimbursement for mortgage payments toward nonmarital property when the marital estate has already been compensated for its contributions by use of the property during marriage").

¶ 91    The record demonstrates that George did not advance this argument before the trial court. In his motion to reconsider, George conceded that "the $552,930 of marital funds that was used to pay off the Woodley loan was a marital contribution" and challenged only the marital estate's entitlement to reimbursement for the earnest money and renovations. Accordingly, George's argument is forfeited as raised for the first time on appeal. *In the Matter of Chance H.*, 2019 IL App (1st) 180053, ¶ 45.

¶ 92                                   iii. *Wisconsin Property Expenses*

¶ 93    George claims he maintained the Wisconsin Property and should be reimbursed for his alleged contribution. Yet again George points to his own "unrebutted and unimpeached" testimony as the basis for his argument that he is entitled to "at least $172,000." We must reject George's argument as the trial court was not obligated to accept his testimony that non-marital funds were used to maintain the Wisconsin Property. George has not turned our attention to any evidence in the record independent of his own testimony and we defer to the trial court's credibility finding against him. *In re T.Y.*, 334 Ill. App. 3d 894, 906 (2002) (the trial court is in the best position to make factual findings and assess the witness credibility).

¶ 94                                              iv. *Gold Coins*

¶ 95    George claims he should have been reimbursed for the gold coins and that the trial court

abused its discretion when it found Jennifer used them as temporary support. We reject George's

arguments. At trial, Jennifer openly admitted that she took the coins and reduced them to cash in

order to deposit on a townhouse. Jennifer testified that "[George] refused to co-sign and [she] had

no employment at the time." The difference between the parties' resources at that time was

apparent and clearly established in the record. We find the trial court's decision was a proper

exercise of discretion.

¶ 96                                              III. CONCLUSION

¶ 97    Based on the foregoing, we reverse the part of the circuit court of Cook County's judgment

that requires George to reimburse the marital estate for $75,500 in earnest money and $882,500 in

renovations. We affirm the judgment in all other respects.

¶ 98    Affirmed in part and reversed in part.